Yuriy KOPYTIN and Yelena
Kopytin, Appellants

v.

William ASCHINGER and Anne
Aschinger, Appellee.

Superior Court of Pennsylvania.

Argued Aug. 29, 2007.

Filed April 14, 2008.

Manuel A. Spigler, Trevose, for appellants.

Sean M. Corr, Warminster, for appellees.

Before: KLEIN, BENDER, and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 This is an appeal from a judgment[1] for Appellant in the amount of

---

1. Appellant purports to appeal from the order denying his post trial motions. Such an order is not final and may not underlie an appeal. However, after the notice of appeal had been filed, judgment was entered on the verdict. Pa.R.A.P. 905(a) provides in perti-

$2,540.92 representing unreimbursed medical expenses in an action based on claims of personal injury incurred in an automobile accident. Finding the award inadequate, and the trial court's construction of Pa.R.C.P. 1311.1 incorrect, we vacate and remand.

¶ 2 In January of 2002, while stopped in traffic, Appellant's car was rear-ended by Appellee's, causing his head to jerk backward and forward. After the accident, Appellant was driven by a friend to his job as a machine operator, but was unable to finish his shift, even sitting down, because he felt dizzy and his shoulders and back ached. He reported having difficulty lying down that night, and a sharp pain in his neck interfered with sleep.

¶ 3 The following day, Appellant sought treatment from a chiropractor, Dr. Olga Itkin, and continued treating with her two or three times a week until the following August. In March he was referred for treatment to a neurologist, Dr. Moisey Levin, who confirmed the chiropractor's diagnosis and prescribed medication for anxiety. Appellant's injuries—post traumatic cervical and lumbar strain and sprain, cervical and lumbosacral radiculopathy, cervicalgia and myofascitis, and sprain and strain of both shoulders, the left elbow and both wrists—left him unable to perform his second job as a pizza delivery man for two months following the collision. As a result he was terminated from that position. In all, he missed six weeks of his regular employment, between the middle of May and the end of June. He had worked prior to that time, although restricted to sedentary duties and assisted by co-workers with any lifting, in order to retain his health insurance coverage.

¶ 4 At trial, Appellant submitted medical bills in excess of those covered by other sources in the amount of $2,540.92. He also provided other documents, including medical reports, pursuant to Pa.R.C.P. 1311.1 [2] pertaining to documentary evi-

---

nent part that "[a] notice of appeal filed after the announcement of a determination but before entry of an appealable order shall be treated as filed after such entry and on the day thereof." This appeal is therefore properly before the Court, See K.H. v. J.R., 573 Pa. 481, 826 A.2d 863, 871–71 (2003), and the caption has been amended accordingly.

**2.** Pa.R.C.P. 1311.1 provides in pertinent part:
Rule 1311.1. Procedure on Appeal. Admission of Documentary Evidence.

(a) The plaintiff may stipulate to $15,000 [now $25,000] as the maximum amount of damages recoverable upon the trial of an appeal from the award of arbitrators. The stipulation shall be filed and served upon every other party at least thirty days from the date the appeal is first listed.

(b) If the plaintiff has filed and served a stipulation as provided in subdivision (a), any party may offer at trial the documents set forth in Rule 1305(b)(1). The documents offered shall be admitted if the party offering them has provided written notice to every other party of the intention to offer the documents at trial at least twenty days from the date the appeal is first listed for trial. The written notice shall be accompanied by a copy of each document to be offered.

(c) A document which is received into evidence under subdivision (b) may be used for only those purposes which would be permissible if the person whose expert testimony is waived by this rule were present and testifying at the hearing. The court shall disregard any portion of a document so received that would be inadmissible if the person whose testimony is waived by this rule were testifying in person.

(d) Any other party may subpoena the person whose testimony is waived by this rule to appear at or serve upon a party a notice to attend the trial and any adverse party may cross-examine the person as to the document as if the person were a witness for the party offering the document. The party issuing the subpoena shall pay the reasonable fees and costs of the person subpoenaed to testify, including a reasonable expert witness fee if applicable.

dence produced on appeal from an arbitration award.[3] Appellee, while conceding that she had, through inattention, struck Appellant's car from the rear,[4] presented under subpoena pursuant to Rule 1311.1(d), the testimony of Appellant's treating chiropractor as on cross-examination, and in addition, a redacted surveillance videotape of Appellant which the trial court described as showing, *inter alia,* his "carrying heavy bags of groceries." (Trial Ct. Op. at 11). The jury returned a verdict in the exact amount of the excess medical expenses, and this appeal followed, requesting that we remand for a new trial on damages only.

■■■ ¶ 5 Preliminarily we note that the appellate court will not reverse the trial court's grant or reversal of a new trial unless its decision presents a gross abuse of discretion or an error of law. *Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116, 1122 (2000). "An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary or capricious, has failed to apply the law, or was motivated by partiality, bias or ill will." *Id.* at 1123. It has long been settled that the grant of a new trial is appropriate only where the verdict is "against the clear weight of the evidence or [where] the judicial process has effected a serious injustice." *Austin v. Ridge,* 435 Pa. 1, 255 A.2d 123, 125 (1969) (citation omitted). We find such an occurrence here.

¶ 6 Appellant has presented six issues, first challenging the amount of the verdict as inconsistent with the evidence, and then assigning error to the trial court's refusal to allow publication to the jury of his ex-

pert reports, its adverse ruling on Appellant's objection to Appellee's adverse inference argument during closing statements, its admission of Appellee's surveillance tape, and its allowing Appellee to cross-examine Appellant's medical expert on prior testimony and documents relating to other patients.

■■ ¶ 7 Appellant's first issue advances the contention that the verdict, which compensated him only for unreimbursed medical expenses, ignored the uncontradicted, objective evidence of pain and suffering. In finding that the "jury award was not inadequate and not inconsistent with the evidence," (Trial Ct. Op. at 10), the trial court relied, in part, on our Supreme Court's opinion in *Davis v. Mullen,* 565 Pa. 386, 773 A.2d 764 (2001). There, where the driver of a truck claimed to have been injured when his vehicle was struck by Mullen's car, the Court held that

[A] jury's award of medical expenses without compensation for pain and suffering should not be disturbed where the trial court had a reasonable basis to believe that: (1) the jury did not believe the plaintiff suffered any pain and suffering, or (2) that a preexisting condition or injury was the sole cause of the alleged pain and suffering.

*Id.* at 767. The *Davis* Court determined that a new trial was not warranted since Davis had not sought treatment until 20 days after the accident, stopped treatment after 20 visits to his chiropractor, took no pain medication for his injuries, missed no work, and sought no further therapy. Nor was his chiropractor able to say with certainty that the injury was related to the

---

**3.** An award of $15,000 was entered in Appellant's favor by the arbitrators.

**4.** The circumstances of the collision as reported by Appellee at trial differed from her version of events in interrogatories, including,

significantly, her speed at impact. (*See N.T.,* 6/1/06, at 41). Photographs of the damage to Appellant's vehicle militate in favor of Appellee's original higher speed estimate.

collision. Thus the plausibility of his claims was clearly questionable. That is not the situation here.

¶ 8 The verdict sheet in this matter queried whether Appellee's negligence was a factual cause of any harm to Appellant.[5] The jury's response was affirmative and uncontested; thus any doubt on the question of whether Appellant sustained injury from the accident is foreclosed. In its opinion, however, the trial court refers to Appellant's "alleged injuries." (Trial Ct. Op. at 2). Thus from the outset dismissing the jury's findings, the court felt itself able to view any award, however small, or none at all, as adequate. This was error.

¶ 9 Moreover, although Appellee produced no medical evidence, the court also found that the expert testimony presented by Appellant's chiropractor had been contradicted because Appellee, "[t]hrough cross examination challenged Dr. Itkin's impressions and treatment of [Appellant] by questioning her credentials, opinions and service." (*Id.* at 11). Specifically, the court noted that defense counsel "insinuated that many of [Dr. Itkin's] clients are involved in personal injury litigation," (*id.*), that Dr. Itkin used pre-printed forms, (*id.* at 12), that she provided services other than those directly associated with chiropractic, and that she had expressed views on causality with which the court disagreed.[6] (*Id.*). Finally, the court posits as contradictory evidence Appellee's surveillance tape showing Appellant in the act of "carrying heavy bags of groceries." (*Id.* at 11).[7]

¶ 10 However, while the trial makes clear its disbelief in Dr. Itkin, it fails to posit any assessment of Appellant's credibility, or that of the neurologist, Dr. Levin. Further, even as to Dr. Itkin, no explanation is provided by the court as to why and in what manner counsel's insinuations, the legal activities of some of Dr. Itkin's other patients, who were represented by Appellant's former counsel, any unrelated medical services she provides or beliefs she may hold, or the unknown weight of grocery bags constitute contradictory **evidence**. In fact, none of what the trial court designates as contradictory evidence is in fact probative matter, either direct or circumstantial, but rather only disparagement, disputation, or, as here, derogation by innuendo. And, while none of this is necessarily improper given its character as impeachment material, the factfinder is nonetheless free to believe all, none, or any portion of the evidence presented; here the jury expressed categorically its affirmative belief that Appellant had been harmed and that Appellee had caused the harm. We conclude that while Appellee attempted to vitiate proof of Appellant's injury, she was unable to do so as the jury finding attests. The question then becomes whether Appellant's acknowledged injuries were "of the types that normally involve pain and suffering." *Burnhauser v. Bumberger*, 745 A.2d 1256, 1261 (Pa.Super.2000).

¶ 11 This Court's decisions in *Womack v. Crowley*, 877 A.2d 1279 (Pa.Super.2005),

---

**5.** There was and is no issue of a pre-existing condition.

**6.** Dr. Itkin, a Ph.D. in physics, stated on cross-examination that there is not necessarily a connection between the force of impact and the nature of an injury, as the latter would depend, *e.g.,* in a fall, on how a person landed. The court's reference is to that discussion. Impact in this instance was demonstrated by the photograph of Appellant's vehicle.

**7.** It should be noted that the surveillance tape was taken two months after the accident. Not only was there no evidence of the bags' actual weight, but by that point the restrictions placed by Dr. Itkin on the weight Appellant could safely lift had been modified.

*appeal denied,* 588 Pa. 751, 902 A.2d 1242 (Pa.2006); *Marsh v. Hanley,* 856 A.2d 138 (Pa.Super.2004); and *Burnhauser, supra* provide controlling analogues to the situation herein. In each of these cases we ruled that the jury award—in the first instance for the cost of a future surgery, in the second for lost wages, and in the third for unreimbursed medical expenses—failed to provide restitution for compensable injuries, that is, for pain and suffering related to injuries of a type which normally, and recognizably afflict the injured party, causing pain and suffering. That is the case herein. Appellant's injuries, in which the jury clearly believed, were the result of an accident caused by Appellee, and were severe enough in the jury's view to require a course of medical treatment which the jury also believed to be compensable, hence the award for unreimbursed medical costs. In failing also to compensate Appellant for the pain and suffering which is normally associated with the type of harm he suffered at Appellee's hands, the jury returned a verdict which "bears no reasonable relation to the injuries suffered," by Appellant. *See id.* Under such circumstances, the award of unreimbursed medical expenses only was inadequate, and the order denying Appellant a new trial on damages must be reversed.[8]

¶ 12 Appellant next argues that the trial court erred in its construction of Pa.R.C.P. 1311.1, thus refusing to permit the reports of his expert witnesses to be read or published to the jury prior to the cross-examination of Dr. Itkin.

■ ¶ 13 We first note that our standard of review in assessing the trial court's evidentiary rulings is extremely narrow. Such decisions are referred to the court's discretion, and will not be disturbed absent both error and harm or prejudice to the complaining party. *Potochnick v. Perry,* 861 A.2d 277, 282 (Pa.Super.2004). When legal issues such as the interpretation of a rule are concerned, "our standard of review is *de novo* and our scope of review is plenary." *Krebs v. United Refining Co. of Pa.,* 893 A.2d 776, 787 (Pa.Super.2006). We further note that "[t]he object of all interpretation and construction of rules is to ascertain and effectuate the intention of the Supreme Court." Pa.R.C.P. 127(a).

■ ¶ 14 Our determination here concerns whether the trial court correctly concluded that Appellee's election to subpoena and cross-examine Dr. Itkin under subsection (d) of Rule 1311.1 operated to preempt Appellant's right under the Rule to submit reports in lieu of testimony. The issue stems from Appellant's decision not to conduct a direct examination of Dr. Itkin at her deposition, but to rest on her report and conduct a redirect after Appellee had cross-examined. The trial court, regarding this as a strategic decision, refused to allow the report to be placed before the jury, either orally or in print, prior to showing the jurors the videotaped cross-examination by Appellee.[9] Appellee describes the issue before us as a complaint that Appellant was not "allowed to go first

8. We address Appellant's remaining issues specifically because this case is being remanded.

9. In explaining its rejection of Appellant's request, the trial court reasoned that "Having a nurse or plaintiff's counsel read [Dr. Itkin's] report [to the jury] would have been overly prejudicial to [Appellee] because the jury would have placed undue weight on the re-

ports." (Trial Ct. Op. at 18). Prior to sending the reports out with the jury for deliberations, the court instructed the jurors that "these documents are entitled to neither more nor less consideration because of the way in which they were presented." (N.T., 6/1/06, at 146). The same instruction could easily have been applied to a presentation of the material during trial.

in getting the evidence into the jury's hands," (Appellee's Brief at 15), since the trial court regarded Appellant's decision not to conduct a direct examination at the deposition as a waiver of his right to present his case to the jury prior to Appellant's cross-examination. The question in fact is what effect, if any, does the election of the non-offering party to subpoena and cross-examine the author of the document(s) being submitted into evidence have on the plaintiff's presentation of his case.

¶ 15 Recently, in *Gaston v. Minhas*, 938 A.2d 453 (Pa.Super.2007), this Court addressed a situation in which an accident victim, on appeal from an arbitration decision by the motorist who injured him, stipulated to the Rule 1311.1 limitation on damages and provided notice of his intention to introduce medical records into evidence at trial without live testimony. The physician who prepared the report was subpoenaed by the motorist to testify at trial but refused to do so on Fifth Amendment grounds. The motorist unsuccessfully objected to the admission of the physician's records, and the jury reached a verdict in favor of the accident victim. The motorist appealed and we reversed, finding that the court's admission of the evidence under such circumstances denied the defense any opportunity for cross-examination, allowing "the doctor's diagnosis and treatment of [the appellee] to go to the jury unchallenged." *Id.* at 457. While this scenario appears to present a situation diametrically opposed to that under review, we regard it as, at least minimally, illuminating on the issue of normative trial rights afforded to each party. We find that here the trial court's construction of the Rule regarding Appellee's election interfered with the proper conduct of the trial.

¶ 16 In *LaRue v. McGuire*, 885 A.2d 549 (Pa.Super.2005), this Court explained that

Rule 1311.1, addressing introduction of evidence on appeal from the award of arbitrators, contributes to the overall goal of compulsory arbitration by reducing the time and costs associated with calling witnesses to authenticate documents that are introduced into evidence at the trial *de novo*. In exchange for this cost-saving benefit, plaintiff agrees to limit damages to $[2]5,000, regardless of the jury's verdict in his or her favor.

*Id.* at 553 (emphasis original). Appellee suggests, as an aside, that "once the adverse party has agreed to pay the plaintiff's experts and thus the cost-shifting purpose of the rule has been satisfied, the case should revert to all normal trial procedures, to the extent possible." (Appellee's Brief at 14 n. 1). Both this proposal, which Appellee concedes addresses no issue raised at trial, and the court's ruling have as the same objective a return to "normal trial procedures." However, as noted, that is not what was achieved.

¶ 17 Subsection (c) of Rule 1311.1 specifies that a document admitted under the Rule "may be used for only those purposes which would be permissible if the person whose testimony is waived by this rule were present and testifying at the hearing." Subsection (d) provides only for cross-examination of the document's author. When read *in pari materia* these two sections permit the introduction to the jury of Dr. Itkin's report as substantive medical opinion which would be permissible were she to have testified on direct examination. "It is well established that a report prepared by an expert who is not called by a witness is [inadmissible] hearsay." *Semieraro v. Com. Utility Equipment Corp.*, 518 Pa. 454, 544 A.2d 46, 47 (1988). Where such a witness is present, however, the issue of admissibility does not arise,[10] as the problems inherent in hear-

---

10. We note in this connection that the report of Dr. Levin, Appellant's neurological expert,

say are resolved by the cross-examination provision of subsection (d) of the Rule, and here, Appellee's election to proceed as it directs. *See Phillips v. Gerhart,* 801 A.2d 568, 575 (Pa.Super.2002) (opinions of treating physician contained in medical records inadmissible hearsay where physician could not be cross-examined as to accuracy, reliability, and veracity of opinions).

¶ 18 Moreover, as Appellant points out, Pennsylvania Suggested Standard Civil Jury Instruction 2.07 assumes the presentation to jurors of the text of the expert's report: "In this case you have had an expert report read into evidence. This report is entitled to the same consideration as if the expert of the report testified in court." Pa. SSJ (Civ) 2.07. While we are aware that the jury instructions are suggested rather than mandated, 2.07 nevertheless tracks the language of subsection (c), which may not be avoided. Accordingly, we find that the trial court's interpretation of the Rule is faulty, as it distorted the normal course of trial order by precluding Appellant from presenting his case prior to Appellee's attempts to subvert it, and left the jury without a basis on which to assess Appellee's cross-examination of Dr. Itkin. We conclude that the report should have been read to the jury, or in the alternative, provided to them in individual copy form prior to Appellee's cross examination.

¶ 19 There is, moreover, one element conveniently omitted in both Appellee's and the trial court's construction of the Rule: nowhere does the suggestion, assumption, or conclusion appear that once an election is made by the defense to finance the appearance of the plaintiff's expert, and it has received the benefit of such generosity, that is, the option to determine trial procedure, that the plaintiff's Rule 1311.1 stipulation to the limit on damages is removed by his putative waiver of the right to go first. In effect, only the limitation of damages, to which Appellant agreed in return for relinquishing his right to live testimony, remains constant. In fact, all that Appellant received in this case as consideration for his stipulation was the prejudicial effect of the trial court's rulings. This should not recur. Because it should not, we decline to address Appellant's next issue, that is, Appellee's insinuation during closing that an adverse inference should be drawn from Appellant's submission of his expert's reports in lieu of live testimony. We note only that Appellee's argument as to the propriety of her closing assumes the correctness of the trial court's interpretation of Rule 1311.1, which we have already found defective.

¶ 20 As to Appellant's claims of improper evidentiary rulings on the sources of certain questions, and the questions themselves, posed to his expert for impeachment purposes, he refers specifically to Appellee's interrogation of Dr. Itkin on the basis of "prior testimony and [medical] reports written by the witness in prior, very similar cases involving the same law firm [ ] which represented [Appellant] before and through the initial stages of this lawsuit." (Appellee's Brief at 18). The information concerned other patients. Because these materials had not been produced during discovery, Appellant argues that their use was improper.

¶ 21 The trial court noted that its allowance of the information for impeachment purposes was related to its interpretation of Rule 1311.1, which it concluded "did not limit cross-examination to only the document admitted through stipulation. Rather, subsection (d) clarifies the opposing party's ability to attack the document as

who was neither deposed nor subpoenaed for

trial, was admitted without objection.

though it were the direct testimony provided by the expert." (Trial Ct. Op. at 21).

¶ 22 Rule 1311.1(d) specifically states that once a document is submitted by stipulation, the opposing party may subpoena the author of the document, and "any adverse party *may cross-examine the person as to the document* as if the person were a witness for the party offering the document." (emphasis added). This provision reflects a concern that where written materials are submitted without authentication, the author may be made available for questioning when concerns arise about the legitimacy of the documents. Thus while the Rule anticipates the need for cross-examination concerning the particular record about which difficulties arise, the language of the Rule does not extend its scope beyond the right of the non-offering party to cross-examine the witness about the document. Since that topic was not the focus of Appellee's questions, the trial court erred in permitting Appellee's interrogation beyond the reach of the Rule.

■ ¶ 23 In his final arguments, Appellant asserts first that the trial court erred in permitting the introduction of a surveillance video tape he characterizes as unauthenticated and thus inadmissible. Appellant also claims that the tape shown to the jury, a 16 minute edition of a 101 minute version, was inadmissible because the prejudice it occasioned outweighed its probative value. In this instance, we agree as to both claims.

¶ 24 Pa.R.E. 901(a) provides that "[t]he requirement of authentication or identification as a precondition to admissibility [of evidence] is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Where, *e.g.*, motion pictures are concerned, the authentication must be "sufficient to support a finding that the demonstrative evidence fairly and accurately represents that which it purports to depict." BINDER, DAVID F., BINDER ON PENNSYLVANIA EVIDENCE, § 9.01 (4th ed. 2005)(citing *Nyce v. Muffley*, 384 Pa. 107, 119 A.2d 530, 533 (1956)).

■ ¶ 25 Demonstrative evidence is "tendered for the purpose of rendering other evidence more comprehensible for the trier of fact." 2 MCCORMICK ON EVIDENCE § 212 (5th ed. 1999). "As in the admission of other evidence, a trial court may admit demonstrative evidence whose relevance outweighs any potential prejudicial effect." *Commonwealth v. Serge*, 586 Pa. 671, 896 A.2d 1170, 1177 (2006) (citation omitted). "Demonstrative evidence may be authenticated by testimony from a witness who has knowledge 'that a matter is what it claimed to be.'" *Id.* (citing Pa.R.E. 901(b)(1)).

¶ 26 At trial, Appellee presented the testimony of Edward Lennon, the principal of the investigative agency employed to conduct the surveillance, although the actual taping had been done by two former employees of the company whose handwritten notes accompanied the tape. It is argued that because Mr. Lennon was neither present at the taping nor had personal knowledge of the circumstances surrounding it, he was unable to state that the tape was in fact a fair and accurate depiction of Appellant at that time.

¶ 27 In his trial testimony, Mr. Lennon reported that his knowledge of the circumstances surrounding the surveillance of Appellant's activities was derived from the handwritten notes submitted with the tape by the two employees who actually shot the film. This is insufficient to authenticate documentary evidence, as it provides no demonstration of knowledge that "a matter is what it is claimed to be." Pa. R.E. 901(b)(1).

¶ 28 As to Appellant's claim that the edited version of the tape was misleading, and that because it was produced one day before trial he had insufficient time to prepare a cross-examination as to the differences between the edited and unedited versions, here, too, we are compelled to agree.

¶ 29 In support of each of his assertions, Appellant relies on Commonwealth Court's holdings. In *McMenamin v. Tartaglione,* 139 Pa.Cmwlth. 269, 590 A.2d 802, 811 (1991), *aff'd. without opinion,* 527 Pa. 286, 590 A.2d 753 (1991), the Court held that the witness called to authenticate a videotape could not do so as he had not actually seen the event recorded. *Id.* at 811. In *Robert Hawthorne, Inc. v. W.C.A.B. (Stone),* 74 Pa.Cmwlth. 635, 460 A.2d 911 (1983), the Court concluded that "a short sequence of film taken after a lengthy period of surveillance often can distort the true nature of a individual's injury, and is thus of questionable value as evidence." *Id.* at 912. While we are not bound by these decisions, we find the reasoning in both illuminating. Although Appellant could conceivably have requested that the entire tape be shown to the jury, thereby eliminating the prejudice he associated with the editorial process, the absence of proper authentication would not have been cured.

¶ 30 Accordingly, for all of the reasons discussed above, we reverse and remand for a new trial on the issue of damages.

¶ 31 Judgment reversed. Case remanded.

¶ 32 Klein, J. files a Concurring Opinion.

## CONCURRING OPINION BY KLEIN, J.:

¶ 1 I fully agree with and join the well reasoned opinion authored by Judge Kelly. I write separately only to note certain problems, alluded to by the Appellee, that are bound to arise. I believe that it will be better to address these problems through the clarification of Rule 1311.1 rather than piecemeal interpretation by our courts. I would therefore urge the Civil Procedural Rules Committee to revisit this Rule.

¶ 2 It is true that in five years since the date of Rule 1311.1's enactment we have seen few cases interpreting it. These problems may have been overlooked because Rule 1311.1 usually deals with cases of smaller monetary value and therefore are less likely to be appealed.

¶ 3 Nonetheless, I suggest that the following situations need to be addressed.

1. **Can plaintiff's counsel withdraw the stipulation to limit damages prior to trial, and, if so, how soon before trial?**

¶ 4 Rule 1311.1 does not address this situation. Would the rule allow the plaintiff to withdraw the stipulation to limit damages and call the doctor to testify live or by deposition? What kind of notice has to be given to the defense? How soon before trial does it have to be done? Does the plaintiff need to show good cause?

¶ 5 Is it better practice for the plaintiff to hold off filing the stipulation for as long as possible and file it after full consideration? Or should the plaintiff have to live with the initial decision? [11]

¶ 6 There certainly are situations where a plaintiff would want to withdraw the

---

11. If the appellate courts are to decide this question, the result will necessarily be driven by the facts of the particular case. The proper answer for one case may not be the best overall answer. This is why I believe that it might be best for the rule drafters to address these issues rather than requiring the courts to address the issues piecemeal.

limitations on damages and pay for the doctor to .come in live or testify by videotape. Let us suppose that a matter was heard at arbitration and at that time the best medical evidence indicated that the plaintiff suffered strains and sprains. However, examination of the plaintiff between the arbitration hearing and the trial, a fairly common happening, reveals that the plaintiff is suffering from a herniated disc and may require surgery. This information might well change the value of the case.

¶ 7 At the moment, the answer to these questions does not readily spring to mind.

## 2. Possibilities after the defense subpoenas the doctor

¶ 8 In this case, we decide that if the plaintiff still only wishes to proceed on reports, the proper procedure is to present the reports and then let the defense cross-examine the doctor based on the reports.

¶ 9 However, other situations are likely to ultimately come up. Because Rule 1311.1 can be vague, there are a number of possibilities, including:

(a) Once the doctor called by the defense, the plaintiff can withdraw the stipulation on damages, can conduct direct examination of the doctor, but does not have to pay him or her.

(b) Once the doctor called by the defense, the plaintiff can withdraw the stipulation on damages, can conduct direct examination of the doctor, but has to pay 100% of his or her fee.

(c) Once the doctor called by the defense, the plaintiff can withdraw the stipulation on damages, can conduct direct examination of the doctor, and has

to pay only a proportion of the doctor's fee.

(d) The plaintiff cannot withdraw the stipulation to limit damages and cannot conduct a direct examination of the doctor but has to rely on reports, even if the defense calls the doctor for cross-examination.

(e) The plaintiff cannot withdraw the stipulation on damages, but can conduct a direct examination and does not have to pay anything for the portion doctor's time.

(f) The plaintiff cannot withdraw the stipulation on damages, can conduct a direct examination, but has to pay a portion doctor's time.

(g) While the plaintiff cannot conduct direct examination of the doctor, after cross-examination he can conduct redirect.

¶ 10 In a situation where the stipulation is filed and the defense subpoenas the witness, the Rule specifically allows for the cross-examination of the witness. It does not, however, say anything about allowing re-direct examination.[12]

¶ 11 No matter what the answer, it seems to me that there is substantial room for doubt in interpreting the Rule as it is currently written.

## 3. How and when is the fee the doctor will charge the defense determined?

¶ 12 If the parties are proceeding under the stipulation, what is the procedure if the witness seeks a fee under Rule 1311.1(d) that may not be reasonable? It is possible the doctor may increase his or her fee because he does not want to be subject to

---

**12.** It appears in this matter the defense conducted its cross-examination and the plaintiff conducted a "re-direct."

cross-examination or wants to help the plaintiff.

¶ 13 The purpose of the rule seems to be preventing the defense in a minor case from making it so expensive for the plaintiff to try the case by calling the doctor that he or she would succumb to a low-ball offer. Before the rule, the very act of taking an appeal, while perfectly proper, could provide unfair leverage to the defense. Rule 1311.1 helps remove that leverage.

¶ 14 However, if the defense calls the doctor, since the doctor often is not a "regular" for the defense bar, he or she would have no inducement to lower his or her fee. Or the doctor may think the fee is reasonable but the defense does not.

¶ 15 What is the procedure for the defendant to challenge that fee? Is it that the expert "owns his or her opinion" and can charge whatever he or she wants? It does appear that there are limits that the court can control. Clearly there are costs attendant to defending an action. The defense routinely pays for the copying of medical records. In fact, while strategically not considered a good idea, a treating physician can be called by subpoena merely by paying the standard witness fee.

¶ 16 While the rule speaks of reasonable fees, there is no indication at all of how to determine the reasonableness of any particular fee. Does the doctor have to appear and fight out the fee later? Can the doctor refuse to appear until the reasonableness of his or her fee is determined by the court?

¶ 17 All of these questions, and undoubtedly many more, are raised by the Appellees' assertion that once the witness has been subpoenaed, things revert to normal trial practice. While the issues are raised, the answers are not immediately found in the Rule. Having been raised, I believe it is in the best interest of the bar and the courts for the Civil Procedure Rules Committee to re-examine the rule and provide answers to these questions.

¶ 18 It is true that in the five plus years since this Rule has been in place there have been few cases interpreting it. The issues have been touched upon and I believe that it is only a matter of time before some or all of them are officially raised on appeal. As I noted earlier in this statement, I believe it will be better for the practice of law and the business of the courts for these policy decisions to be made by the Pennsylvania Supreme Court upon recommendation of the Civil Procedural Rules Committee rather than by the appellate courts, one at a time, as they come up. That is why I have commented on these issues here and invite the Rules Committee to take up the matter.