Filed 9/9/14  Bayer v. Eckersley CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| OMAR BAYTER,<br><br>       Plaintiff and Appellant,<br><br>v.<br><br>WENDY ECKERSLEY,<br><br>       Defendant and Appellant. | B239831<br>(Los Angeles County<br>Super. Ct. No. EC050750) |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Milton, Judge.  Affirmed.

The Yarnall Firm and Delores A. Yarnall; Martinian & Assoc., Inc., and Tigran Martinian for Plaintiff and Appellant.

Mark R. Weiner & Associates and Kathryn Albarian for Defendant and Appellant.

After judgment was entered in favor of plaintiff and appellant Omar Bayter in his negligence action against defendant and appellant Wendy Eckersley, the trial court denied Bayter's motion for a new trial. Bayter contends he is entitled to a new trial on his damages due to errors at trial regarding the presentation of evidence regarding those damages. Eckersley has filed a protective cross appeal, arguing that if a new trial is granted, it should encompass the issue of liability because the trial court improperly denied her request for instructions on comparative negligence. We reject Bayter's contentions of error, thus rendering it unnecessary for us to address Eckersley's cross appeal. We therefore affirm.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A. *Complaint*

On August 20, 2009, Bayter initiated the underlying action for negligence and negligence per se against Eckersley. His complaint alleged that on March 7, 2008, as he was driving on Scott Road in Burbank, Eckersley negligently drove her car out of a parking garage and collided with his car. The complaint further alleged that Eckersley's conduct caused physical, emotional, and financial injury to Bayter.

B. *Trial*

1. *Bayter's Evidence*

Bayter testified that on March 7, 2008, he was driving to work along Scott Road. After slowing for some construction work, he began to resume his speed when a car driven by Eckersley suddenly appeared and struck his vehicle. Bayter could not avoid the collision. He immediately felt a twisting of his spine and pain, but declined an invitation from paramedics to be taken to an emergency room because he lacked medical insurance.

After experiencing severe headaches and back pain, he saw a chiropractor, who recommended various treatments. In addition, Bayter tried "self treatment" for his pain. When his pain persisted, he saw Dr. Roy Simon, a physician who had used epidural injections to treat a spinal disc herniation that Bayter suffered in a car accident in 2007. After Simon concluded that the same treatment would be ineffective for Bayter's back injuries following the March 2008 accident, Bayter underwent back surgery in October 2010.

Bayter testified that prior to his 2007 accident, he had no significant back problems, although he had been in several minor car accidents and briefly underwent therapy for a strained back in 2000. Following the 2007 accident, Bayter suffered back pain, but Simon's treatment largely eliminated his pain by the end of 2007. After the March 2008 accident, Bayter's back pain made the pain he felt in 2007 seem like "child's play." He had great difficulty performing ordinary functions, such as walking, sitting for lengthy periods, and running. Although surgery relieved some of his pain, Bayter remained unable to run, play contact sports, and dance.

During cross-examination, Bayter testified that in August 2009, he began to walk with a limp. Following that testimony, defense counsel played for the jury a so-called "sub rosa" surveillance video recording dated September 1, 2010, prior to Bayter's surgery. The video recording, taken without Bayter's knowledge, showed him walking with no apparent difficulty and without a limp.

Eckersley testified that on March 7, 2008, she drove out of the parking garage of her residence, stopped on the driveway entrance to Scott Road, and looked to her left for oncoming traffic.[1] When she made a right turn onto Scott

---

[1]    Eckersley testified as an adverse witness (Evid. Code, § 776).

3

Road, Bayter's car hit her car. According to Eckersley, she never saw Bayter's car before the collision. She told Burbank Police Department Officer Randy Lloyd, the investigating officer, that a parked truck blocked her view of Scott Road to the left of the driveway, and later challenged a citation issued to her on the ground that the collision was due to a lack of visibility where the driveway met Scott Road, rather than to wrongdoing on her part.

In interrogatory responses, Eckersley denied that she was "at fault" for the collision. At trial, she initially asserted that Bayter had been negligent, stating that she would have seen his car had he not been speeding. Later, she denied "liability" for the collision, but said that she was "the sole party responsible for the accident." She also acknowledged that her challenge to the citation was unsuccessful.

Officer Lloyd testified that the damage to Bayter's car was inconsistent with a low speed departure from the parking garage. Eckersley told Lloyd that a parked truck had obscured her view of the street to her left. He issued a citation to Eckersley for failing to yield the right of way upon entering a public street (Veh. Code, § 21804, subd. (a)).

Ronald Stone and Ana Rodriguez testified that they knew Bayter prior to the March 2008 accident. According to Stone and Rodriguez, before the collision, Bayter manifested no inability to walk or get around, but after it, he appeared to find walking difficult due to back problems.

Bayter offered expert testimony to establish that the March 2008 accident caused significant injury to him, including serious injury to his spine. Kenneth Solomon, an expert in accident reconstruction, opined that Eckersley caused the collision, that Bayter was travelling less than 30 miles per hour when it occurred, and that the forces it created were sufficient to cause the physical injuries that Bayter claimed. Solomon offered no opinion regarding how fast Eckersley's car was moving when it collided with Bayter's car.

4

Dr. Roy Simon testified that in July 2007, he diagnosed Bayter as suffering from a herniation to his "L-5 S-1" spinal disc due to a car accident. He treated Bayter with epidural injections, which significantly reduced Bayter's pain. In January 2008, Simon discharged Bayter from his care, with the recommendation that Bayter engage in physical therapy, if necessary, and see a physician every four months to obtain medications. According to Simon's discharge report, Bayter manifested a seven millimeter herniation to his disc that might require surgery in the future.

Dr. Simon further testified that in June 2008, he again saw Bayter, who complained regarding back pain. He reviewed an MRI, which disclosed an eight to nine millimeter herniation on Bayter's L-5 S-1 disc. Because Simon did not believe that epidural injections would be effective to treat the herniation, he referred Bayter to a spine surgeon. Simon opined that the March 2008 accident caused the herniation he discovered in June 2008.

Dr. David Payne testified that he performed spinal surgery on Bayter in October 2010. Payne first saw Bayter in June 2010. Following an examination of Bayter and his medical records, Payne concluded that Bayter had suffered a significant injury in the March 2008 accident that resisted nonsurgical treatment. At trial, Payne opined that the March 2008 accident caused spinal injuries beyond those from the 2007 accident. He also opined that the medical expenses Bayter incurred following the March 2008 accident -- which totaled $380,671.38 -- were for necessary and reasonable treatment.

Robert Johnson, a forensic economist, estimated that Bayter's lost wages (adjusted to present value) totaled $715,197. He further opined that the costs of Bayter's "life care plan" -- the medical treatment he would need in the future to

address his back problems flowing from the March 2008 accident -- totaled $349,775 (adjusted to present value).[2]

### 2. *Eckersley's Evidence*

Dr. Stephen Rothman, a neuroradiologist, testified that he had examined Bayter's MRI scans following his 2007 and March 2008 accidents. Rothman opined that after the 2007 accident, Bayter displayed a degenerative disc, that is, a protruding "worn" disc likely to worsen over time. He furthered opined that there was no material change in that disc following the March 2008 accident. According to Rothman, a significant herniation in the disc first appeared in an MRI scan taken in August 2009. At the time, there was a hole in the disc, and a portion of the disc -- which Rothman likened to a "lump of jelly" -- had been ejected from it.

Dr. Robert Wilson, an orthopedic surgeon, testified that car accidents rarely cause disc protrusions, and that the vast majority of them result from "genetics'" He opined that the one millimeter difference between Bayter's herniation, as disclosed by the MRI scans taken before and after the March 2008 accident, was "meaningless," as spinal discs ordinarily fluctuate "day by day." During cross-examination, in response to hypothetical questions, he also opined that the forces Bayter experienced in the March 2008 accident were unlikely to have caused a disc herniation.

Marcela Ramirez testified that she was the controller for Regent Global Sourcing, which hired Bayter in February 2008 to assist with accounts receivable. According to Ramirez, he was a slow worker whose tempo did not improve with

---

[2] Johnson based his estimate on a plan prepared by Amy Sutton, a life care planner who also testified at trial.

training.  Although Ramirez knew of the March 2008 accident, Bayter never told her that it interfered with his work.  In April 2008, she discharged him.

### C.  *Special Verdicts, Judgment, and Motion for a New Trial*

Following the presentation of evidence, the trial court rejected Eckersley's request for instructions on comparative negligence.  The jury returned special verdicts, finding that Eckersley was negligent, that her negligence was a substantial factor in the causation of injury to Bayter, and that his damages totaled $8,305.00.

On December 19, 2011, the trial court entered judgment in Bayter's favor in accordance with the jury's special verdicts.  In December 30, 2011, Bayter moved for a new trial.  On February 3, 2012, the trial court denied the motion for a new trial.  On March 15, 2012, the court issued an amended judgment.

## DISCUSSION

Bayter challenges the judgment, arguing that he is entitled to a new trial limited to damages.  He does not dispute the jury's special verdicts regarding liability; rather, he asserts interrelated contentions of error regarding the presentation and admission of evidence regarding the amount of damages, and argues that those errors cumulatively resulted in reversible prejudice.  The purported errors include Eckersley's failure to provide her exhibits prior to trial, the improper disclosure of Dr. Simon's misdemeanor conviction for lewd conduct, irregularities related to the defense experts' opinion testimony, and the presentation of the sub rosa surveillance video recording.  For the reasons discussed below, we conclude that he has shown no reversible error.

A. *Governing Principles*

Our review follows established principles. Generally, rulings regarding the admissibility of evidence are consigned to the trial court's discretion. (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 639.) That discretion permits the court to control the cross-examination of witnesses (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 118) and the presentation of impeachment evidence (*People v. Ricciardi* (2012) 54 Cal.4th 758, 808-809). Ordinarily, absent a timely, specific, and correct objection or other challenge to an item of evidence, a party may not attack its admission on appeal. (3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, §§ 371-372, pp. 519-521.)

Furthermore, on appeal, "[w]e do not review the trial court's reasoning, but rather its ruling. A trial court's order is affirmed if correct on any theory . . . . [Citations]." (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15-16.) Thus, we may affirm a ruling "on any basis presented by the record whether or not relied upon by the trial court." (*Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 252, fn. 1.) This principle encompasses evidentiary rulings. (*Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 785-786 (*Grimshaw*).)

Only prejudicial error supports reversal of the judgment. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780.) Ordinarily, an error or defect at trial is harmless unless "there is a 'reasonabl[e] probab[ility]' that it affected the verdict." (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.) In this context, "a 'probability' . . . does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility. [Citations.]" (*College Hospital, Inc., supra,* at p. 715.)

B. *Failure to Comply With Local Rules*

Bayter contends the trial court improperly failed to ensure that Eckersley complied with rule 3.25(h)(1) of the Superior Court Los Angeles County, Local Rules (rule 3.25(h)(1)), which states: "At least five days prior to the final status conference, counsel must serve and file lists of pre-marked exhibits to be used at trial . . . . Failure to exchange and file these items *may* result in not being able to call witnesses, present exhibits at trial, or have a jury trial." (Italics added.) Bayter maintains that Eckersley's failure to provide an exhibit list and exchange exhibits denied him access to four types of evidence: (1) the reports prepared by the defense experts, Dr. Wilson and Dr. Rothman; (2) powerpoint slides that Rothman displayed while testifying; (3) some medical studies that Wilson identified while testifying; and (4) the sub rosa surveillance video recording that Eckersley presented to impeach Bayter. He further argues that Eckersley's noncompliance with rule 3.25(h)(1) with respect to those times impaired his ability to cross-examine her experts and address the sub rosa video recording. As explained below, he has failed to establish his contentions.

Rule 3.25(h)(1), by its plain language, consigns to the trial court's discretion the determination whether noncompliance with the rule in a specific situation warrants the exclusion of an item of evidence. Generally, to the extent that an exercise of the discretion rests on findings, we review the findings for the existence of substantial evidence. (*Federal Home Loan Mortgage Corp. v. La Conchita Ranch Co.* (1998) 68 Cal.App.4th 856, 860; *Roddis v. All-Coverage Ins. Exchange* (1967) 250 Cal.App.2d 304, 309.)

We begin with the defense experts' reports. Following the presentation of evidence at trial, Eckersley's counsel, Maria Skinner, sought their admission. Bayter's counsel, Delores Yarnall, opposed the request on several grounds, including Skinner's noncompliance with rule 3.25(h)(1). In response, Skinner

9

maintained that the reports had been produced during discovery. When Yarnall stated that she was unsure whether she already had the reports, the court gave her an opportunity to examine them, and ordered a brief recess. Following the recess, Yarnall never suggested that she had not, in fact, received the reports Skinner sought to admit. In view of Yarnall's conduct, we conclude that the trial court reasonably found Skinner's noncompliance with rule 3.25(h)(1) was harmless.

We reach a similar conclusion regarding Dr. Rothman's powerpoint slides. When Dr. Rothman began his powerpoint demonstration, Yarnall's co-counsel, Andrew Zeytuntsyan asserted several objections, including that the slides had not been exchanged before trial as exhibits. Skinner maintained that the slides were simply copies of MRI scans that Bayter already possessed, and had used as exhibits during the presentation of his case-in-chief. As we elaborate below (see pt. E.2.b., *post*), Bayter failed to preserve his contention because Zeytuntsyan did not object when told during Dr. Rothman's deposition that the powerpoint presentation would be unavailable until Dr. Rothman's trial testimony; moreover, before the trial court and on appeal, Bayter has shown no material discrepancy between Dr. Rothman's slides and the MRI scans that Bayter used at trial. He has thus established no abuse of discretion.

Bayter's contentions regarding the remaining items fail for the same reason, namely, that they fall outside the scope of rule 3.25(h)(1). Although Dr. Wilson referred to some medical studies in explaining the basis for his expert opinions, Eckersley never sought to present or display those studies as exhibits. As to the video recording, the Superior Court Los Angeles County, Local Rules do not require parties to include impeachment exhibits on their exhibit lists or disclose them in advance of trial. Rule 3.151 of those rules, entitled "Marking Of Exhibits First Disclosed During Trial," states: "Counsel must mark for identification an exhibit which *has not been pre-marked* and which is being *used for impeachment*

10

before showing the exhibit to opposing counsel or referring to it. . . .” (Italics added.) Accordingly, Eckersley's presentation of the video recording did not contravene the local rules. In sum, Bayter has failed to establish his contentions of error related to local rule 3.25(h)(1).

### C. *Dr. Simon's Misdemeanor Conviction For Lewd Conduct*

Relying on interrelated arguments, Bayter contends he is entitled to a new trial due to the presentation of testimony regarding Dr. Simon's misdemeanor conviction for lewd conduct. Although his principal contention is that the trial court made erroneous rulings that effectively compelled Dr. Simon to testify regarding that conviction, he presents several other contentions, including that the court clerk improperly accessed Dr. Simon's criminal records. As explained below, Bayter has failed to establish his contentions, as the trial court made no ruling regarding the admissibility of the conviction before Bayter's counsel voluntarily elicited the pertinent testimony, and Bayter never objected to the court clerk's conduct.

#### 1. *Underlying Proceedings*

Prior to trial, Bayter filed a motion in limine to exclude references to Dr. Simon's misdemeanor reckless driving conviction. According to the motion, that conviction led the California Medical Association to place Dr. Simon's license to practice medicine on a probationary status. The motion nonetheless maintained that when Simon treated Bayter following his 2007 accident, Simon had a valid medical license, notwithstanding his probation. The motion argued that the conviction was not for a felony conviction admissible to impeach him under Evidence Code section 788, and that it was subject to exclusion under Evidence

11

Code section 352. The trial court granted the motion, absent further evidence demonstrating the conviction's admissibility.

During the trial, immediately before Skinner (Eckersley's counsel) began her cross-examination of Dr. Simon, the trial court conducted a bench conference. Skinner requested reconsideration of the ruling on the motion in limine, stating that she had learned that Simon's medical license had been suspended due to a conviction for lewd conduct. When the court asked for proof, Skinner stated that although Bayter's attorneys had promised to provide her with information regarding his purported reckless driving conviction, they had failed to do so. When she examined what she called "the board website," she became aware of the lewd conduct conviction.

After noting that misdemeanor conduct displaying moral turpitude may be admissible under *People v. Wheeler* (1992) 4 Cal.4th 284 (*Wheeler*), the court informed Yarnall (Bayter's counsel) that the conviction was potentially relevant. The following exchange then occurred:

"Ms. Yarnall: Perhaps we can continue the argument [until] we find out if the [Web site information] has anything to do with the doctor. Maybe it's someone with the same name.

"The Court: We must make sure that's confirmed before there are any questions about it in the presence of the panel." The court and counsel then discussed other issues.

Later, during the same conference, the court clerk stated that he or she had found a record of a "criminal appeal" showing that Dr. Simon "was caught with [a] prostitute," and that he had been sentenced to two days in jail and one day on probation. The court remarked that although Simon's misdemeanor conduct potentially fell under *Wheeler*, there was a question regarding the conduct's admissibility because the conviction had been expunged. When the court directed

12

Yarnall's attention to cases interpreting *Wheeler*, she replied, "I will read them, Your Honor, but I would ask . . . [you] to inquire, when did Ms. Skinner learn this? . . . We could have addressed this. We could have briefed it. We could have read your cases. I could have been ready to argue it."

The court decided to give the parties an opportunity to "research these issues," and stated that it was necessary "to delay [Dr. Simon's] further examination." In response, Yarnall requested that the court exclude the conviction under Evidence Code 352, arguing that the conviction had no impact on his authority or ability to treat Bayter. When the court asked the clerk for further information regarding the date of the offense, the clerk answered that Simon had been convicted in 2000 and suffered a suspension of his license in 2002. Skinner then proposed that the parties simply stipulate that Simon's license had been suspended so that she would not "have to get into the details." The court replied: "If you can resolve it, if you can stipulate to some way to resolve the issue, it would [suffice]. Otherwise, this witness will have to return after briefing by the parties."

Following a recess, the court convened another bench conference regarding Dr. Simon's conviction. Yarnall stated: "It is Rosh Hashana. [Dr. Simon] has to be at temple with his family. [¶] Your honor, *we ask to bring this up on direct* so []he can explain, not on cross, not [the] conviction, but just . . . the conduct, as I think your honor tentatively ruled. That way we would be done with this today, and the witness can go on with his life." (Italics added.) Yarnall nonetheless stated that Simon's testimony would be presented "over [an] objection." Simon, who was present during the conference, stated that he could not testify after lunch on that date.

The following colloquy then occurred:

"The Court: Well, the Court has indicated *it wanted briefing* from your lawyers, and *you're declining to do that now*, and *I'm wanting to approach it now*, so the Court has a tentatively final ruling on that.

"Ms. Yarnall: Let it stand as it is. Do you want me to argue it?

"The Court: Do you want to further discuss it outside the presence [of the jury]?

"Ms. Yarnall: *No*, your Honor.

"[Ms. Skinner]: One final comment, your Honor. The Court *has not finally decided that.* So you'll be mak[ing] your decisions at the Court's suggestion [that] it can be addressed at a later date?[**3**]

"Ms. Yarnall: *Yes*, your Honor.

"The Court: And *you are wanting to proceed in that fashion*? [¶] . . . [¶]

"Ms. Yarnall: *Let my co-counsel* [Zeytuntsyan] *make the decision*." (Italics added.)

Immediately after that remark, Zeytuntsyan reopened his direct examination of Dr. Simon. When Simon acknowledged that at some point he had been on probation with respect to his medical license, Zeytuntsyan asked, "Did that have anything to do . . . with your actions from a medical standpoint? In response, Simon volunteered a detailed account of his arrest for lewd conduct in 2002, and also stated that he suffered a "DUI" approximately 15 years before the trial.

2. *Analysis*

We conclude that all of Bayter's contentions fail. As noted above, his main contention is that the court's rulings regarding Dr. Simon's lewd conduct

---

**3** Although the reporter's transcript attributes this remark to the court, it appears to be by Skinner.

14

conviction improperly compelled him to testify regarding that conviction. We disagree. The record establishes that the court made *no* final ruling regarding the admissibility of evidence regarding that conviction. Rather, the court ruled only (1) that Simon's testimony would be delayed to permit the parties to brief that issue, and (2) that if Bayter were to *forego* the opportunity to submit briefs, it would render a final ruling. Following those determinations, Bayter's counsel declined to submit a brief, and prior to any final ruling, elected to question Simon on direct examination regarding his conviction.

Bayter has therefore failed to preserve his contention of error regarding the admission of that testimony. Generally, "whe[n] evidence of facts likely to be prejudicial to a party [is] invited, or . . . [is] stated in open court by him, he is under well-settled principles in no position to complain . . . ." (*Zarafonitis v. Yellow Cab Co.* (1932) 127 Cal.App. 607, 609.) Thus, in *People v. Ramos* (1997) 15 Cal.4th 1133, 1167 (*Ramos*), the defendant was aware that the prosecutor might rely on the defendant's diary to challenge or impeach his testimony. Although the defendant pressed for a ruling that the diary was inadmissible for any purpose, the trial court reserved its ruling pending completion of the defendant's testimony. (*Ibid*.) To minimize the diary's impact, the defendant introduced it himself. (*Ibid*.) Our Supreme Court rejected the defendant's contentions of error regarding the admission of the diary, stating: "Since [the defendant] 'is responsible for the introduction of [this] evidence, he cannot complain on appeal that its admission was error. [Citations.]' Estoppel applies even if he acted preemptively to reduce the diary's impact: in either situation the record is equally devoid of any basis for finding error. [Citation.] . . . As matters stand, we can only speculate that the prosecutor would have sought to introduce it in rebuttal; that the trial court would have erroneously overruled a proper objection; and that its admission would have

been prejudicial under whatever evidentiary circumstances then prevailed."
(*Ramos*, *supra*, 15 Cal.4th at p. 1168.)

*Ramos* is dispositive here. The record shows that Skinner did not intend to present evidence regarding Dr. Simon's conviction, but only evidence regarding his probation; moreover, it is speculation what -- if any -- evidence the trial court would have admitted upon briefing. Accordingly, Bayter cannot establish his contention of error.[4]

Bayter contends that the trial court's rulings presented an "unfair choice." However, we see no impropriety in those rulings. Generally, courts have broad and inherent authority to deal with the rights of parties and control the admission of evidence. (*Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1377, 1378.) Here, the court reasonably requested briefing regarding the admissibility of evidence related to Simon's conviction, and throughout the proceedings related to that evidence, it displayed an evenhanded regard for the interests of the parties and Dr. Simon.[5]

Bayter's contention regarding the court clerk's conduct also fails. Bayter's attorneys never objected to the clerk's providing information regarding Dr. Simon

---

[4] Although Bayter suggests that his attorneys were compelled to elicit the testimony in question from Dr. Simon because they needed to complete his testimony and lacked control over him, his briefs on appeal identify no evidence to support that contention. The record discloses only that when Yarnall told the trial court that Simon wanted to attend temple on Rosh Hashana, Simon stated, "I'm not coming back after lunch today, so if you can't do it before lunch, *I'll see you another day*." (Italics added.) Bayter's contention thus fails for want of evidence.

[5] In related contentions, Bayter asserts that the court failed to require proper foundation for admission of the evidence, and conducted no analysis of the evidence's admissibility under Evidence Code section 352. For the reasons discussed above, the court cannot be faulted for declining to address those matters in order to afford the parties an opportunity to submit briefing.

prior to his testimony, and suggested that the clerk had engaged in misconduct for the first time in their new trial motion. Accordingly, the contention was forfeited. (See 8 Witkin, Cal. Procedure (5th ed. 2008) Attack on Judgment in Trial Court, § 21, pp. 602-603.) In sum, Bayter has failed to show reversible error from Simon's direct testimony regarding his lewd conduct conviction.

### D. *Admission of Defense Expert Reports*

Bayter contends the trial court erroneously admitted reports by Dr. Wilson and Dr. Rothman, relying on grounds other than Skinner's noncompliance with rule 3.25(h)(1) (see pt. B., *ante*). Following the presentation of evidence, the trial court admitted the reports over a hearsay objection, apparently concluding that they fell within the hearsay exception for business records. As explained below, Bayter has shown no reversible error regarding the reports.

### 1. *Dr. Wilson's Report*

In ruling on the new trial motion, the court concluded that admitting Dr. Wilson's report, if error, was harmless. We agree with that determination. Assuming that Wilson's report was inadmissible hearsay, its admission was not prejudicial.[6]

Dr. Wilson's six-page report, dated March 30, 2010, was prepared following his examination of Bayter, which occurred after the underlying litigation was initiated, but before Bayter underwent surgery. The report described Bayter's

---

[6]    Generally, an expert's report prepared in anticipation of litigation is not admissible under the business records exception, unless it displays sufficient indicia of trustworthiness. (*Rovetti v. City and County of San Francisco* (1982) 131 Cal.App.3d 973, 981.)

"current complaints," as follows: "[Bayter] continues to have pain about his back and . . . it bothers him with sitting, driving, walking, bending, and putting on his shoes and socks." After providing a brief description of the March 2008 accident, the report noted that Bayter "decline[] to give any further history regarding the incident." Under the section entitled "Current Treatment," the report stated that Bayter's sole treatment was pain medication; in the section entitled "Past Medical History," the report identified only the 2007 accident. (Caps omitted.)

Following a description of the results of Dr. Wilson's physical examination, the report contained a final two-page section entitled "Discussion." There, Wilson stated that he had reviewed the police report regarding the March 2008 accident and Bayter's medical records, and intended to review Bayter's X-rays when they became available. Pointing to Bayter's medical records and the results of Wilson's physical examination, Wilson concluded that Bayter suffered from a "longstanding preexisting lumbar pathology which would not be due to the events of March [] 2008." (Caps omitted.)

In our view, there is no reasonable chance that the report affected the verdict, as its material contents were cumulative of Dr. Wilson's trial testimony. At trial, Wilson testified that he had examined Bayter in March 2010, and described the medical records he had reviewed prior to that examination. As in the report, Wilson opined that Bayter suffered from degenerative disc disease, and further stated that the reported change in the size of Bayter's herniation following the March 2008 accident was "meaningless."

Bayter contends the report was likely to confuse the jury because the "current complaints" and medical records it reflected predated his surgery in October 2010. However, during cross-examination, Yarnall asked Dr. Wilson whether he had reviewed the medical records relating to Bayter's surgery, including those from Dr. Payne, who performed the surgery. After replying in the

18

affirmative, Wilson stated that he had not recommended surgery when he examined Bayter. The jury was thus informed that Wilson's report did not encompass Bayter's post-surgery complaints.[7]

Bayter also contends that admission of the report was likely to mislead the jury regarding Bayter's complaints because it omitted certain key complaints. We disagree. The report stated: "Medical records related how the patient struck his forehead on the steering wheel[,] and he was complaining of right and left shoulder pain, left wrist, left thigh, right forehead and right orbital pain." During direct and cross-examination, Dr. Wilson described Bayter's complaints in March 2010 in precisely those terms. Because Wilson's trial testimony tracked the report's description of Bayter's complaints, the admission of the report was not reasonably likely to have affected the verdict.

In a related contention, Bayter maintains that the report contained a prejudicial reference to x-ray results. The report stated: "The patient underwent radiographs of the bilateral shoulders which showed acromiclavicular joint separation bilaterally. [¶] *If the actual x-ray*[] *films are available, I request they be sent to my office for review.* [¶] The initial evaluation would be consistent with soft tissue injuries, musculoligamentous strains/sprains[,] as well as . . . head trauma

---

[7] Bayter suggests that the report falsely stated that in March 2010, Bayter was receiving no treatment other than pain medication. However, because Dr. Wilson's trial testimony never challenged the existence of the surgery or the accuracy of Dr. Payne's records, it is not reasonably likely that the report misled the jury regarding whether Bayter was considering surgery when Dr. Wilson examined him.

Bayter also suggests that the trial court improperly limited Yarnall's examination of Dr. Wilson regarding his review of Dr. Payne's records. However, as that contention is presented on appeal without supporting argument, he has forfeited it.

19

and contusions." The report itself thus shows that Dr. Wilson had not seen the x-rays, and that he deferred placing reliance on them until he saw them. At trial, Wilson affirmed his initial evaluation that the March 2008 accident caused nothing more that "soft tissue injuries," which he predicated on his expertise regarding the types of injuries caused by car accidents. Accordingly, it is not reasonably likely that the report led the jury to conclude that x-rays not identified or discussed at trial supported Wilson's opinions.

### 2. *Dr. Rothman's Report*

For similar reasons, we reject Bayter's contention regarding Dr. Rothman's report.[8] Assuming -- without deciding -- that the report was inadmissible hearsay, its admission was harmless. Rothman's two-page report states only the opinion he offered at trial, namely, after the 2007 accident, Bayter's MRI scans displayed a degenerative disc, that the MRI scans following the March 2008 accident showed no material change in that disc, and that a significant herniation in the disc first appeared in an MRI scan taken in August 2009. There is thus no reasonable chance that the report affected the verdict. In sum, the admission of the defense experts' reports was not prejudicial.

### E. *Defense Experts' Testimony*

Bayter contends the trial court improperly permitted a powerpoint presentation by Dr. Rothman and testimony regarding certain medical studies by Dr. Wilson. Aside from challenging those aspects of the experts' testimony on the

---

[8] We note that because Bayter's new trial motion did not challenge the admission of Dr. Rothman's report, the trial court did not address that report in ruling on the motion.

basis of rule 3.25(h)(1) (see pt. B., *ante*), Bayter argues that they contravened *Kennemur v. State of California* (1982) 133 Cal.App.3d 907 (*Kennemur*), and otherwise reflected noncompliance with Eckersley's discovery obligations.  As explained below, Bayter has failed to establish his contentions.

### 1.  *Governing Principles*

In some circumstances, the trial court may exclude evidence offered by an expert for noncompliance with discovery rules.  (*Easterby v. Clark* (2009) 171 Cal.App.4th 772, 778 (*Easterby*); *Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936 (*Boston*).)  Under Code of Civil Procedure section 2034.210, any party may demand information regarding an adverse party's expert witnesses, including "all discoverable reports and writings, if any, made by [a designated] expert . . . in the course of preparing that expert's opinion" (Code Civ. Proc., § 2034.210, subd. (c)).[9]  Section 2034.300, subdivision (c), further provides that the trial court "shall exclude from evidence the expert opinion of any witness" when the adverse party has "unreasonably failed" to "[p]roduce reports and writings" subject to an appropriate demand.  The trial court's determination regarding whether the failure to produce those items was unreasonable is reviewed for an abuse of discretion.  (*Boston, supra*, 170 Cal.App.4th at p. 950.)

Section 2034.260 also requires that the parties exchange specified information regarding expert witnesses, including "a brief narrative statement of the general substance of the testimony that the expert is expected to give" (*Id.,* subd. (c)(2) ).  Generally, California courts have interpreted that provision to

---

[9]     All further statutory citations are to the Code of Civil Procedure, unless otherwise indicated.

21

require disclosure of the substance of the expert's testimony in a witness exchange list or during a deposition. (*Easterby*, *supra*, 171 Cal.App.4th at p. 778.)

In *Kennemur*, the plaintiff called an expert at trial to testify regarding the causation of the plaintiff's injuries, even though the expert testified during his depositions that he had no opinion on that issue. (*Kennemur, supra*, 133 Cal.App.3d at pp. 912-913.) After the trial court barred that testimony, the appellate court affirmed, stating: "When appropriate demand is made for exchange of expert witness lists, the party is required to disclose not only the name, address and qualifications of the witness but the *general substance* of the testimony the witness is expected to give at trial. [Citation.] In our view, this means the party must disclose either in his witness exchange list or at his expert's deposition, if the expert is asked, the substance of the facts and the opinions which the expert will testify to at trial. Only by such a disclosure will the opposing party have reasonable notice of the specific areas of investigation by the expert, the opinions he has reached and the reasons supporting the opinions, to the end the opposing party can prepare for cross-examination and rebuttal of the expert's testimony." (*Kennemur*, *supra*, 133 Cal.App.3d at p. 919.) The trial court's determination regarding whether a party has made an adequate disclosure of the witness's testimony is reviewed for an abuse of discretion. (*Esterby*, *supra*, 171 Cal.App.4th at p. 778.)

### 2. *Dr. Rothman's Powerpoint Presentation*

We begin with Dr. Rothman's powerpoint presentation. Bayter argues that the slides incorporated into the presentation were inadmissible on several grounds, including that their use contravened *Kennemur*, and that Eckersley improperly failed to produce them in discovery.

### a. *Underlying Proceedings*

In noticing Dr. Rothman's deposition, Bayter demanded the production of all items "that were relied upon . . . in arriving at any expert opinion that [Rothman] intends to offer at the time of trial," including "demonstrative evidence . . . and films." At the deposition, Rothman testified that he had received and examined Bayter's MRI scans taken before and after the March 2008 accident. He opined -- as at trial -- that after the 2007 accident, Bayter's MRI scans displayed a degenerative disc, that the MRI scans taken after March 2008 accident showed no material change in the disc, and that a significant herniation in the disc first appeared in an MRI scan taken in August 2009. He also testified that "25 percent of normal, healthy people have disc herniations and they don't know it. So the overwhelming majority of disc herniations have simply nothing to do with trauma . . . ." Near the end of the deposition, he informed Zeytuntsyan (Bayter's counsel) that the night before he was to testify, he planned to prepare a powerpoint presentation of the MRI scans. At Zeytuntsyan's request, Rothman identified the scans he intended to incorporate in the presentation.

At trial, during Bayter's case-in-chief, Dr. Simon and Dr. Payne displayed Bayter's MRI scans to the jury. Later, Dr. Rothman testified that in evaluating Bayter's condition, he had reviewed three MRI scans, "photograph[ed]" them, and put them in his laptop so that he could project them. When Rothman displayed the first slide depicting an MRI scan in his powerpoint presentation, Zeytuntsyan asserted that the slide "lack[ed] foundation" and had not been identified as an exhibit. After the trial court gave Skinner (Eckersley's counsel) an opportunity to lay a foundation, Rothman testified that he had generated the slide from one of Bayter's MRI scans, and Skinner informed the court that the underlying MRI scan had been marked as an exhibit by Bayter. The court overruled Zeytuntsyan's objections.

23

Later, Dr. Rothman displayed a powerpoint slide of a chart showing that 20 percent of normal healthy persons have a herniated disc. Zeytuntsyan raised an objection under *Kennemur*, arguing that "the slides were never produced." He also asserted that "no foundation" had been laid because there was "no chain of custody." In response, Skinner argued that the MRI scans underlying Rothman's presentation had already been used as exhibits by Bayter's expert witnesses, and that when deposed, Rothman told Bayter's counsel that he intended to use a powerpoint demonstration based on the MRI scans. The trial court remarked that Zeytuntsyan's "lack of foundation" objection had already been overruled. Observing that Zeytuntsyan's remaining objection to the slides was not properly characterized as "a *Kennemur* objection," but rather as "failure of discovery," the court overruled it, stating that he saw nothing more than "demonstrative use."

b. *Analysis*

The record establishes that the powerpoint presentation included (1) slides depicting MRI scans and (2) a single slide reflecting the frequency of disc herniations in healthy people. As explained below, Bayter has shown no reversible error with respect to either type of slide.

To the extent Bayter challenges the powerpoint slides depicting MRI scans, the court correctly concluded that *Kennemur* did not bar the powerpoint presentation, as the slides did not exceed the substance of Dr. Rothman's opinions, as disclosed at his deposition. During the deposition, Dr. Rothman predicated his opinions on Bayter's MRI scans, and he told Zeytuntsyan that he intended to prepare a powerpoint presentation based on those scans.

Furthermore, the court correctly overruled the objection based on a failure of discovery regarding the slides depicting the MRI scans. To obtain exclusion of the powerpoint slides on that ground, Bayter was obliged to show that Eckersley's

24

failure to produce the slides was unreasonable (§ 2034.300, subd. (c)).  However, when Dr. Rothman told Zeytuntsyan during the deposition that he intended to prepare his powerpoint presentation of the MRI scans "*the night before* [*he was*] *due to testify*," Zeytuntsyan raised no objection.  (Italics added.)  Bayter thus forfeited his contention that he was entitled to obtain the slides in discovery prior to Rothman's testimony at trial.

Bayter's remaining objection -- which he characterizes on appeal as an objection to the slides' authentication -- fails for want of a showing of error.  Authentication of a writing is defined as "(a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.)  Generally, the proponent can show that a writing is what the proponent claims it to be in many ways, including testimony from a participant in the creation of the writing  (*DuBois v. Sparrow* (1979) 92 Cal.App.3d 290, 295-296), circumstantial evidence (*McAllister v. George* (1977) 73 Cal.App.3d 258, 263), and admissions by the opposing party (Evid. Code, § 1414, subd. (a)).  Here, Dr. Rothman testified that he generated the powerpoint slides by "photograph[ing]" the MRI scans themselves and putting those photographs in his laptop so that they could be displayed.  In our view, that testimony was sufficient to authenticate the slides.

Even if there were some type of error, we would conclude that Bayter failed to show prejudice.  "[A] party challenging a judgment has the burden of showing reversible error by an adequate record." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574.)  Here, the record contains no suggestion that the slides were inaccurate copies of the underlying MRI scans, as Bayter's counsel requested no continuance to examine the slides, and never identified any discrepancy between the slides and the underlying MRI scans, even though their own experts had shown the

25

underlying scans to the jury. Accordingly, nothing before us establishes that there was a reasonable chance that the slides influenced the verdict due to inaccuracies in them.

The record otherwise supports the reasonable inference that excluding the slides would not have affected the verdict. The trial court stated that Dr. Rothman's powerpoint presentation constituted nothing more than "demonstrative use," that is, Rothman relied on the slides solely to facilitate the presentation of his opinions. Accordingly, if the slides had been excluded, Rothman would have stated the *same* opinions, albeit by reference to the MRI scans that the jury had seen during the testimony from Bayter's medical experts.

Bayter's contentions regarding the remaining slide -- namely, the slide depicting the frequency of disc herniations in healthy people -- fails for a related reason, namely, the want of a record sufficient to show error. On appeal, "'error is never presumed, but must be affirmatively shown, and the burden is upon the appellant to present a record showing it, any uncertainty in the record in that respect being resolved against him.'" (*People v. Clifton* (1969) 270 Cal.App.2d 860, 862, quoting 3 Cal.Jur.2d (1952) Appeal and Error, § 260, p. 781.) The record contains no copy of the slide in question, and nothing before us shows that it displayed more than the *exact* content of Dr. Rothman's trial testimony regarding the frequency of disc herniations in healthy people. As the substance of that testimony was disclosed during his deposition, such a slide cannot reasonably be regarded as contravening *Kennemur* or the rules of discovery, or as subject to the

26

authentication requirement.  Accordingly, Bayter has failed to show reversible error regarding Rothman's powerpoint presentation.[10]


### 3. *Dr. Wilson's Testimony*

Bayter contends the trial court erred in permitting Dr. Wilson to refer to certain medical studies and offer opinions as a biomechanical expert.  The crux of his contentions is that the studies and opinions were never disclosed during his deposition or at any other time during discovery.


### a. *Underlying Proceedings*

In noticing Dr. Wilson's depositions, Bayter demanded the production of all documents "that establish the basis for [Dr. Wilson's ] expert opinion(s) to be rendered in this case."  When deposed, Dr. Wilson testified that car accidents generally caused injuries other than "soft tissue" injuries only when the speed of a collision exceeded 50 miles per hour, and that even high speed collisions rarely cause disc protrusions; he was also examined regarding his opinions, as stated in his March 30, 2010 report (see pt. E.1., *ante*).  He further testified that although he had expertise in biomechanics, he intended to offer no specific biomechanical opinions regarding the injuries likely to arise due to certain factors in a collision, namely, differences in the speeds of the colliding vehicles and the angle of the collision.  When Zeytuntsyan asked Dr. Wilson to describe the bases of the opinions he intended to offer at trial, he stated that his conclusions relied on his

---

[10]     On appeal, Bayter contends the powerpoint presentation constituted inadmissible hearsay.  As the record reflects no timely and specific objection to the presentation on that ground, he forfeited it.

medical experience, training, and "knowledge of all the literature," and that he had not done a "literature search in this particular case."

Prior to trial, Bayter filed a motion in limine under *Kennemur*, requesting that Dr. Wilson's trial testimony be limited to the opinions he provided in his deposition. The court granted the motion. At trial, when Skinner asked Dr. Wilson whether he had training in biomechanics, Yarnall (Bayter's counsel) objected on the ground that Dr. Wilson had "stated no opinions." The court decided to permit Skinner to establish Dr. Wilson's qualifications as an expert in biomechanics, and defer ruling on any *Kennemur* objections until Dr. Wilson was asked specific questions.

Later, in response to Skinner's questions regarding Bayter's injuries, Dr. Wilson stated: "Disc protrusions aren't caused by car accidents." In support of that statement, Dr. Wilson identified and briefly described three medical studies. Yarnall objected as follows: "Your Honor, I'm going to ask for [a] sidebar. *Kennemur* again. None of this was produced in literature research." The court overruled the objection.

During Dr. Wilson's cross-examination, he stated that some twisting motions can cause a disc protrusion. Yarnall asked whether the forces generated in the March 2008 accident were likely to cause Bayter to twist his body. Dr. Wilson replied, "Significantly, no." Soon afterward, in response to objections from Skinner, the court conducted a bench conference. The court said to Yarnall: "The court is not understanding. There was an objection about *Kennemur* and biomechanics. You go right into the heart . . . ." Yarnall replied, "My understanding was that your Honor did allow [Skinner] to question. He specifically said that you can hurt your spine with a rotation. *I'm establishing that that's what happened here.* He even said that he was certified. He's taught biomechanical . . . ." (Italics added.)

28

Following the bench conference, through a hypothetical question, Yarnall asked whether the March 2008 accident was likely to cause the type of twisting responsible for a disc protrusion. Dr. Wilson replied, "That wouldn't occur."

b. *Analysis*

Bayter contends the court erred under *Kennemur* in permitting Dr. Wilson to offer biomechanical opinions during his cross-examination. We disagree. The record reflects that the court intended to address *Kennemur* objections to Dr. Wilson's testimony on a question-by-question basis. As explained above (see pt. E.3.a., *ante*), because Yarnall elicited the testimony in question, Bayter has forfeited his contention of error regarding it.

Bayter also contends the court improperly permitted Dr. Wilson to discuss studies never disclosed in his deposition or during discovery. Although we agree that the court erred in failing to exclude Dr. Wilson's references to the studies, the error cannot be regarded as prejudicial. At the outset, we observe that neither *Kennemur* nor section 2034.300, subdivision (c), required the exclusion of Dr. Wilson's opinion testimony related to the reports. Dr. Wilson's opinion testimony at trial did not contravene *Kennemur* because it never went beyond the "general substance" of his opinions, as disclosed in his deposition. (*Kennemur*, *supra*, 133 Cal.App.3d at p. 919.) Nor did Dr. Wilson's references to the studies warrant exclusion of his testimony under section 2034.300, as those studies were not "made by" Dr. Wilson. (*Boston, supra*, 170 Cal.App.4th at pp. 950-955; § 2034.210, subd. (a).) Under the circumstances, the appropriate course of action was to exclude Dr. Wilson's references to the studies at trial. (See *Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 991; § 2023.030.)

On the record before us, there is no reasonable chance that exclusion of those references would have affected the verdict. As Dr. Wilson's deposition

testimony discloses, he was prepared to opine that car accidents rarely cause disc protrusions on the basis of his general knowledge of the available medical literature.  Furthermore, Yarnall elicited his opinion that the specific forces involved in the March 2008 accident were unlikely to cause a disc protrusion.  In sum, Bayter has failed to establish reversible error regarding Dr. Rothman's powerpoint presentation and Dr. Wilson's testimony.

F.  *The Surveillance Video Recording*

Bayter contends the trial court erred in permitting Eckersley to impeach him with the surveillance video recording, which showed him walking without a limp on September 1, 2010, notwithstanding his testimony that he developed a limp in 2009.  He challenges the presentation of the video recording on several grounds, including that Eckersley improperly failed to produce the video recording during discovery.  As explained below, we reject his contentions.

1.  *Underlying Proceedings*

After Bayter testified on cross-examination that he began to limp in August 2009, Skinner (Eckersley's counsel) requested leave to present the video recording, which displayed a time stamp indicating that it was made on September 1, 2010, the month before his surgery.[11]  In opposition, Yarnall (Bayter's counsel) maintained that Eckersley had failed to produce the video recording during discovery, arguing that when Bayter propounded a special supplemental interrogatory on August 1, 2011, seeking such recordings, Eckersley failed to

---

[11]     Although Skinner initially stated that the video recording was made on October 1, 2010, the parties later agreed that its time stamp reflected a creation date of September 1, 2010.

acknowledge its existence. Skinner replied that she should be permitted to impeach Bayter, notwithstanding any discovery violation.

After viewing the video recording, the court stated: "It's definitely impeach[ment] of . . . his testimony to this panel. But there's been a failure in discovery, in the court's assessment. . . . [T]he court cannot permit something that doesn't appear to be true to stand . . . ." The court thus permitted the video recording to be presented to the jury. Prior to that ruling, Bayter's counsel asserted no objection regarding the video recording other than that there was a failure of discovery, and counsel requested no continuance to examine the video recording. After the jury viewed the video recording, Yarnall and Skinner questioned Bayter regarding it, who acknowledged that it showed him and his daughter.

Bayter's motion for a new trial asserted that the presentation of the video recording entitled him to a new trial. In opposition to the motion, Skinner maintained that there had been no improper failure of discovery regarding the video recording. She submitted a declaration stating: "Both parties conducted pre-trial discovery in this matter. [Bayter] served his demand for production of documents, set one, on January 20, 2010, and his supplemental request for production of documents, set one, on June 8, 2010. At the time [Eckersley] responded, the sub rosa video [she] used at trial did not exist. [Bayter] served a second supplemental request for production of documents on August 4, 2011. [Eckersley] objected to this request as untimely on September 7, 2011."

In denying the new trial motion, the court found that there was no failure of discovery, stating: "The video was not in existence at the time of the original demand . . . and supplemental demand . . . . A second supplemental demand on August 4, 2011 was untimely."

31

## 2. *Analysis*

We conclude that Bayter has failed to establish his contentions. We reject his principal contention, namely, that Eckersley engaged in improper "discovery gamesmanship" regarding the video recording. Demands for the production of documents are directed toward documents "in the *possession*, *custody*, or *control* of the party on whom the demand is made." (§ 2031.010, subd. (b), italics added.) Eckersley was thus not required to produce the video recording before discovery closed, as Bayter's requests pre-dated its creation. Furthermore, "[o]nce the discovery cut[-]off date has run and discovery has closed, the only means provided in the Civil Discovery Act for reopening discovery is a motion for leave of court." (*In re Marriage of Boblitt* (2014) 223 Cal.App.4th 1004, 1024.) Nothing before us suggests that Bayter was entitled to production of the video recording after discovery closed.[12]

Bayter contends that no evidence was presented to authenticate the video recording or establish the accuracy of the time stamp on it. As Bayter never objected to the video recording on those grounds prior to his new trial motion, he has forfeited his contention of error. (*Kirkpatrick v. Tapo Oil Co.* (1956) 144 Cal.App.2d 404, 410 [relevance and hearsay objections to document before trial

---

[12]  Although Bayter's briefs assert that the trial court erred in determining that Bayter's August 4, 2011 supplemental demand was untimely, the only evidence in the record regarding that matter is Skinner's declaration. Bayter's contention thus fails on the record he had provided.

Bayter also suggests the trial court's decision to allow presentation of the video recording cannot be affirmed on appeal because the ruling relied on an incorrect rationale, namely, that impeachment evidence not properly produced during discovery may nonetheless be admitted at trial. It is unnecessary for us to resolve whether that rationale is incorrect, however, because we may affirm the
*(Fn. continued on next page.)*

32

court insufficient to preserve challenge to its authentication]; see *Dell Merk, Inc. v. Franzia* (2005) 132 Cal.App.4th 443, 446, fn. 2 [challenge to document's authentication raised on appeal forfeited due to absence of authentication objection before trial court].)[13]  Moreover, Bayter's own testimony identifying himself in the video recording was sufficient to authenticate the recording.

Bayter also contends the video recording was inadmissible because it constituted ""''unfair surprise.''""  He argues that he "had no opportunity to have any expert examine the video, no opportunity to cross-examine any person connected with either creating or editing the video, and no opportunity to see the out-takes of the video."  We disagree.

Evidence is not rendered inadmissible merely because it is not produced in discovery, despite correct application of discovery procedures by the parties.  (See *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 674.)  In *Kelly*, the appellate court concluded that such evidence is not properly excluded under Evidence Code section 352 on the purported ground of "unfair surprise," stating: "'Discovery . . . and pretrial conference . . . are means of preventing such surprise. And if, despite diligent preparation and use of these procedures, evidence is

---

ruling on the ground that there was no discovery failure.  (*Grimshaw*, *supra*, 119 Cal.App.3d at pp. 785-786.)

[13]     Bayter argues that Yarnall's comments during the bench conference preceding the video recording's presentation alerted the court to a challenge regarding authentication.  We disagree.  When Skinner requested leave to present the video recording, Yarnall stated, "I don't know when it was taped," noted that Bayter had made several discovery requests for surveillance video recordings, and then remarked, "It may be very recent, *that's fine, if so*." (Italics added.)  Viewed in context, Yarnall's remarks related to her argument that Eckersley may have failed to produce the video recording in discovery.  The record otherwise shows that Bayter first challenged the authentication of the video recording in his new trial motion.

introduced which is so important and so wholly outside reasonable anticipation that the other party is harmed by its sudden introduction, *the appropriate remedy is a request for a continuance*. [Citation.]'" (*Kelly, supra,* 49 Cal.App.4th at p. 674, quoting 1 Witkin, Cal. Evidence (3d ed. 1986) Circumstantial Evidence, § 307, p. 277, italics added.) Here, Bayter requested no continuance.

Bayter's reliance on several decisions is misplaced. In some of the cases, the court concluded only that upon a proper request, a party is entitled to discovery regarding a surveillance video recording to be used at trial.[14] In the remaining cases, the appellate court concluded that a surveillance video recording may not be presented at trial when there is a breach of a discovery or procedural rule, or a timely and correct evidentiary objection.[15] As explained above, none of those

---

[14] *Suezaki v. Superior Court of Santa Clara County* (1962) 58 Cal.2d 166, 170-179; *Fisher v. National R.R. Passenger Corp.* (S.D. Ind. 1993) 152 F.R.D. 145, 150; *Forbes v. Hawaiian Tug & Barge Corp.* (D. Hawaii 1989) 125 F.R.D. 505, 507; *Snead v. American Export-Isbrandtsen Lines, Inc.* (E.D. Pa. 1973) 59 F.R.D. 148, 151; *Kane v. Her-Pet Refrig.* (N.Y.App.Div. 1992) 587 N.Y.S.2d 339 [181 A.D.2d 257, 260-268]; *Camelback Contractors, Inc. v. Industrial Com'n* (Ariz. App. 1980) 608 P.2d 782, 784.

[15] *Chiasson v. Zapata Gulf Marine Corp.* (5th Cir. 1993) 988 F.2d 513, 515-517 [proponent of video recording failed to disclose it, in contravention of federal discovery rules]; *Clark v. Matthews* (La.App. 5 Cir. 2005) 891 So.2d 799, 803-805 [trial court correctly excluded video recording when proponent improperly failed to produce it in discovery]; *Roundy v. Staley* (Utah App. 1999) 984 P.2d 404, 407-409 [proponent of video recording failed to disclose it, in contravention of state discovery rules]; *Pistella v. W.C.A.B. (Samson Buick Body Shop)* (Pa. Comwlth. 1993) 159 Pa.Commw. 342, 348 [633 A.2d 230, 232] [administrative judge improperly admitted video recording over authentication objection]; *La Villarena, Inc. v. Acosta* (Fla.Dist.Ct.App. 1992) 597 So.2d 336, 338 [proponent of video recording failed to disclose it, in contravention of pre-trial order]; *Williams v. Dixie Elec. Power Ass'n* (Miss. 1987) 514 So.2d 332, 335-337 [proponent of video recording failed to disclose it, in contravention of state discovery rules]; *Crist v. (Fn. continued on next page.)*

34

circumstances is present here.  In sum, Bayter has shown no error regarding the presentation of the surveillance video recording.**16**

---

*Goody* (1972) 31 Colo.App. 496, 499 [507 P.2d 478, 480] [proponent of video recording failed to disclose it, in contravention of state procedural rules].

We recognize that in one of these decisions, *Kopytin v. Aschinger* (2008) 2008 Pa. Super. 68 [947 A.2d 739, 747-749], the appellate court held that a video recording was improperly admitted because it was more prejudicial than probative and lacked authentication, without noting the existence of timely evidentiary objections before the trial court.  Nonetheless, under Pennsylvania law, challenges to evidence, including those based on lack of authentication, are forfeited in the absence of a timely objection. (*Wachovia Bank, N.A. v. Gemini Equip. Co.* (2006) 1 Pa. D. & C.5th 235, 244-245.)

**16** In view of our determinations, it is unnecessary for us to address Eckersley's cross-appeal.

## DISPOSITION

The judgment is affirmed.  Eckersley is awarded her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

WILLHITE, P. J.

EDMON, J.*

_____

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.